**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01387-WJM-MDB

JUNIPER MCGINN,

     Plaintiff,

v.

EL PASO COUNTY, COLORADO,
SHERIFF BILL ELDER, in his individual and official capacities,
BRITTANY STUBBS, in her individual capacity,
CHRISTOPHER CABLE, in his individual capacity,
LARRY THURMAN, in his individual capacity,
LORALEE SALAZAR, in her individual capacity,
VITA BARNES, in her individual capacity,

     Defendants.

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

     Plaintiff Juniper McGinn, by and through her attorneys, Andy McNulty and Mari Newman of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for her Second Amended Complaint and Jury Demand as follows:

**INTRODUCTION**

     1.     Juniper McGinn is a transgender woman who has been diagnosed with Gender Dysphoria. In the community, she lives in accordance with her female gender identity. Ms. McGinn was taken to the El Paso County Jail on June 2, 2020, after being arrested for participating in a Black Lives Matter protest in the wake of the murder of George Floyd. Despite her well-documented history of being a transgender woman who suffers from Gender Dysphoria, while at the El Paso County Jail, Ms. McGinn was subjected to a humiliating visual body-cavity search by a male deputy. While being subjected to this humiliating search, multiple male

1

deputies watched Ms. McGinn and laughed at her. Ms. McGinn's humiliating visual body-cavity search was not the first time that a transgender woman inmate would be subjected to this demeaning, and discriminatory, treatment by the El Paso County Jail. In fact, the El Paso County Jail's policies, which were promulgated by Sheriff Bill Elder, required that deputies perform highly invasive cross-gender visual body-cavity searches of transgender inmates. Ms. McGinn suffered significant emotional trauma from the humiliation she was subjected to at the El Paso County Jail.

2.      Ms. McGinn files this lawsuit to hold El Paso County accountable for its routine violation of the Constitution. She seeks to vindicate her rights and the rights of all other transgender women in El Paso County who have been subjected to completely unnecessary cross-gender visual body-cavity searches.

## PARTIES

3.      At all times relevant to this Second Amended Complaint, Plaintiff Juniper McGinn was a citizen of the United States of America and a resident of the State of Colorado. Ms. McGinn was a pretrial detainee at all times relevant to this Second Amended Complaint.

4.      At all times relevant to this Second Amended Complaint, Defendant El Paso County, Colorado ("El Paso County") was a Colorado municipal corporation.

5.      At all times relevant to the subject matter of this litigation, Defendant Bill Elder was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as the Sheriff of El Paso County. Pursuant to Colorado law, Defendant Elder is the official who manages and controls the correctional institutions operated by El Paso County, including the El Paso County Jail, and who is responsible for developing policies and procedures with respect to the operation of the El Paso County Jail. Sheriff Elder is responsible

for trains and supervises the officials who operate the El Paso County Jail.

6.      At all times relevant to the subject matter of this litigation, Defendant Brittany Stubbs was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Brittany Stubbs was acting under color of state law in her capacity as a deputy employed by El Paso County and Defendant Elder.

7.      At all times relevant to the subject matter of this litigation, Defendant Christopher Cable was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Christopher Cable was acting under color of state law in his capacity as a deputy employed by El Paso County and Defendant Elder.

8.      At all times relevant to the subject matter of this litigation, Defendant Larry Thurman was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Larry Thurman was acting under color of state law in his capacity as a deputy employed by El Paso County and Defendant Elder.

9.      At all times relevant to the subject matter of this litigation, Defendant Loralee Salazar was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Loralee Salazar was acting under color of state law in her capacity as an entry officer and specialist employed by El Paso County and Defendant Elder.

10.      At all times relevant to the subject matter of this litigation, Defendant Vita Barnes was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Vita Barnes was acting under color of state law in her capacity as an entry officer and specialist employed by El Paso County and Defendant Elder.

## JURISDICTION AND VENUE

11.     This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

12.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District.

13.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

## FACTUAL ALLEGATIONS

### Gender Identity, Gender Dysphoria, and the incarceration of transgender women like Ms. McGinn.

14.     Gender identity is an innate, internal sense of one's sex—e.g., being male or female—and is a basic part of every person's core identity. Everyone has a gender identity. Most people's gender identity is consistent with the sex they were assigned at birth ("assigned sex"). Transgender people, however, have a gender identity that is different from their assigned sex. For example, a transgender woman is a woman who was assigned male at birth and has a female gender identity. A cisgender woman is a woman who was assigned female at birth and has a female gender identity.

15.     The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-5") recognizes that being transgender is not itself a disability, but that the clinically relevant condition is the "Gender Dysphoria" experienced by many individuals whose gender identity conflicts with their assigned sex. Gender Dysphoria is defined as the significant distress that may accompany the incongruence between a transgender

person's gender identity and assigned sex. This distress limits major life activities and is therefore a disability. A transgender person's Gender Dysphoria can be alleviated when the person is able to live, and be treated by others, consistently with the person's gender identity.

16.     The accepted course of medical treatment to alleviate the symptoms of Gender Dysphoria often involves allowing the individual to live as his or her chosen gender through one or more of the following treatments: changes in gender expression and role; dressing, grooming, and otherwise outwardly presenting in a manner consistent with one's gender identity; hormone therapy; psychotherapy; and, in some cases, surgery to change primary and/or secondary sex characteristics.

17.     Ms. McGinn has been diagnosed with Gender Dysphoria and has been openly living as a transgender woman in the community. As part of her medically supervised treatment, she changed her name and altered her physical appearance to conform to her female gender identity, including dressing in feminine attire.

18.     At all times relevant to this action, Defendants were aware of Ms. McGinn's Gender Dysphoria and her identity as a transgender woman.

19.     At all times relevant to this action, Defendants were aware of Ms. McGinn's history of Gender Dysphoria and her identity as a transgender woman.

20.     At all times relevant to this action, Defendants perceived Ms. McGinn as having Gender Dysphoria and being a transgender woman.

21.     Ms. MsGinn's Gender Dysphoria is a mental impairment that substantially limits one or more major life activities.

22.     Ms. MsGinn is substantially limited in her ability to care for herself because she requires regular, ongoing, and life-long medical treatment, including ongoing psychotherapy and

periodic hormone treatment. She is also substantially limited in other major life activities, such as eating, sleeping, learning, concentrating, thinking, communicating, and interacting with others because of distress associated with her Gender Dysphoria

23.    Ms. McGinn is substantially limited in the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

24.    Ms. McGinn has a history of Gender Dysphoria, which substantially limits one or more major life activities, including the ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and which substantially limits neurological function, brain function, endocrine function, and reproductive function.

25.    When a transgender person's Gender Dysphoria is left untreated, or is inadequately treated, the consequences can be dire. Symptoms of untreated Gender Dysphoria often include intense emotional suffering, anxiety and depression, suicidality, and thoughts or acts of self-harm. All of those symptoms can be mitigated, and often prevented altogether, for transgender people with access to appropriate individualized medical care.

**Ms. McGinn is subjected to an unconstitutional cross-gender visual body-cavity search pursuant to El Paso County's official policy that male guards conduct visual body-cavity searches of transgender women inmates.**

26.    After being unlawfully arrested for an alleged misdemeanor crime during a Black Lives Matter protest,[1] Ms. McGinn was placed into a mass arrest van and taken to the El Paso County Jail. On arrival at the Jail, Ms. McGinn was asked if she wanted a man or a woman to process her. Ms. McGinn responded that she wanted a woman to process her into the Jail.

---

[1] The charges against Ms. McGinn were later dismissed.

27.     Despite this, Ms. McGinn was told that, per El Paso County policy, a female deputy would watch her shower, and conduct a visual body-cavity search of, the top half of her body then a male deputy would watch her shower, and conduct a visual body-cavity search of, the bottom half of her body.

28.     Despite her request to have only a woman deputy present during her shower and visual body-cavity search, per El Paso County policy, multiple male deputies watched Ms. McGinn shower.

29.     Defendants Brittany Stubbs, Christopher Cable, Larry Thurman, Loralee Salazar, and Vita Barnes watched Ms. McGinn shower. Defendants Brittany Stubbs, Christopher Cable, Larry Thurman, Loralee Salazar, and Vita Barnes viewed her naked body during the visual body-cavity search. There was no basis to have five officials watching Ms. McGinn as she showered and was subjected to a visual body-cavity search. Defendants Brittany Stubbs, Loralee Salazar, and Vita Barnes did nothing to intervene to make sure that Defendants Christopher Cable and Larry Thurman were prevented from seeing Ms. McGinn's naked body.

30.     Defendants Brittany Stubbs, Christopher Cable, Larry Thurman, Loralee Salazar, and/or Vita Barnes watched and laughed at Ms. McGinn as she showered. Ms. McGinn was humiliated and kept her head down as she showered. After she was done showering, Defendants Brittany Stubbs, Christopher Cable, Larry Thurman, Loralee Salazar, and/or Vita Barnes continued to laugh at Ms. McGinn as she was told to squat and move her genitals while Defendants Brittany Stubbs, Christopher Cable, Larry Thurman, Loralee Salazar, and/or Vita Barnes visually inspected her naked body and performed a visual body-cavity search of Ms. McGinn.

31.     There was penological purpose for conducting a cross-gender visual body-cavity search of Ms. McGinn. There was no penological purpose for subjecting Ms. McGinn to a visual body-cavity search at all. And, there was certainly no penological purpose for any of the actions taken by Defendant Brittany Stubbs, Christopher Cable, Larry Thurman, Loralee Salazar, and/or Vita Barnes in humiliating Ms. McGinn during the cross-gender visual body-cavity search.

32.     El Paso County officials' derogatory visual body-cavity search of Ms. McGinn lead her to suffer significant emotional distress.

33.     El Paso County's decision to require that Ms. McGinn be subjected to a cross-gender visual body-cavity search, along with forcing her to be observed while she showered by male deputies, simply because she is a transgender woman, was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria.

**It is customary for male El Paso County deputies to humiliate transgender woman inmates while conducting these visual body-cavity searches without consequence.**

34.     Ms. McGinn's cross-gender body-cavity search was not the only time that an El Paso County deputy conducted an unconstitutional cross-gender body-cavity search of a transgender woman inmate.

35.     On July 20, 2020, a male deputy at the El Paso County Jail performed a visual body-cavity search of a transgender woman named Darlene Griffith in a similarly humiliating manner to Ms. McGinn. When Ms. Griffith was booked into the jail, she was taken to the strip out room. Before Ms. Griffith began stripping off her clothes, both a male and female deputy arrived. When Ms. Griffith saw that both a male and female deputy would be conducting her visual body-cavity search, Ms. Griffith protested and asked that the male deputy leave. Ms. Griffith told both deputies that, because she is transgender, she does not want a male deputy to be present. The female deputy told Ms. Griffith that, per her sergeant's orders, the male deputy

would stay throughout the entire strip out process. The female deputy told Ms. Griffith that because she was "still a male" in El Paso County's "system" that a male deputy would be conducting her visual body-cavity search pursuant to El Paso County policy and procedure. Ms. Griffith again asked that the female deputy conduct the visual body-cavity search because Ms. Griffith is a transgender woman. The female deputy refused.

36.     The female deputy then told Ms. Griffith to take off her shirt, which she did. After examining Ms. Griffith's breasts, with the male deputy present, the female deputy gave Ms. Griffith a sports bra and then left the room. As the female deputy left the room, she told the male deputy, "*he* is all yours now to strip out." After the female deputy left the room, the male deputy ordered Ms. Griffith to take off her socks, pants, and panties, and then place her hands on the wall. The male deputy then told Ms. Griffith to step back, bend over, and "spread [her] sexy cheeks." Ms. Griffith protested the male deputy's use of this derogatory language, but complied with his directive. The male deputy then told Ms. Griffith that he was "going to go balls deep in that ass" while grabbing his own penis in view of Ms. Griffith. The male deputy was extremely aggressive while searching Ms. Griffith's genitals and making these comments. After the male deputy was finished sexually harassing Ms. Griffith, he told her that she had better not tell anyone about what he did and said to her.

37.     After this initial search, throughout Ms. Griffith's incarceration, she was subjected to ongoing and consistent discriminatory treatment. Ms. Griffith was constantly mis-gendered. She was housed in an all-male unit, even after being sexually assaulted. She was subjected to constant cross-gender pat-down searches. She was denied clothing that conformed with her gender identity.

38.     The treatment of Ms. McGinn and Ms. Griffith demonstrates that it is the custom and practice within the El Paso County Jail to discriminate against transgender inmates in every aspect of their incarceration, including during searches.

39.     The El Paso County Jail has never imposed any discipline on the deputies who conducted the derogatory and unconstitutional cross-gender visual body-cavity searches of Ms. McGinn and Ms. Griffith. It has also never disciplined any of its officials for their discriminatory treatment of Ms. McGinn and Ms. Griffith.

**El Paso County's automatic blanket visual body-cavity search policy on intake causes the customary violation of inmates' constitutional rights.**

40.     Per El Paso County policy, every person, upon intake to the facility, is subjected to a visual body-cavity search no matter their security threat status, the crime they are arrested for allegedly violating, or their risk of bringing contraband into the facility.

41.     Pursuant to this policy, Ms. McGinn was subjected to a visual body-cavity search when she entered the facility, despite the fact that she was arrested for allegedly committing a non-violent misdemeanor crime, she posed no threat to security, and there was no basis to believe that Ms. McGinn was trying to bring contraband into the facility.

42.     This de facto blanket visual body-cavity search policy, in and of itself, violated Ms. McGinn's Constitutional rights.

**El Paso County completely lacks adequate policies, training, and supervision when it comes to the treatment of transgender inmates.**

43.     El Paso County regularly incarcerates transgender individuals. The treatment, and search, of transgender individuals is a situation that El Paso County officials, including Defendant Elder, knows that its officials will routinely have to engage in.

44.     Unlike every other county in Colorado with a similar, or larger, population size, at the time of Ms. McGinn's incarceration, El Paso County lacked a specific policy relating to the treatment of transgender individuals housed in its facility. El Paso County also lacked a non-discrimination policy as to transgender individuals.

45.     Specifically, at the time of Ms. McGinn's incarceration, El Paso County lacked any policies dictating how, by whom, and when transgender inmates would be searched. Because of this, at the time of Ms. McGinn's incarceration, El Paso County's general policies explicitly dictated that transgender individuals were to be subjected to visual body-cavity searches upon intake searched by a deputy of the sex that corresponded with a transgender individual's genitals, not with their gender identity.

46.     As a result, at the El Paso County Jail, per El Paso County policy, female deputies conduct visual body-cavity searches of women and male deputies conduct visual body-cavity searches of men. The only time that cross-gender visual body-cavity searches occur, per El Paso County policy, is when El Paso County Jail deputies are searching transgender women or transgender men.

47.     It is El Paso County's official policy that transgender women (including those with Gender Dysphoria) are searched, including visual body-cavity searched, by male staff and not by female staff. Per El Paso County policy, no female guards are required to be present during searches (including visual body-cavity searches). Transgender women in El Paso County custody have routinely been subjected to searches, including visual body-cavity searches, by male staff.

48.     El Paso County's policies led Ms. McGinn to be subjected to a cross-gender visual body-cavity search upon arrival at the El Paso County Jail.

49.     Additionally, at the time of (and prior to) Ms. McGinn's incarceration, El Paso County did not provide any training on the treatment of transgender men and women within its facility, including training relating to the Americans with Disabilities Act and the United States Constitution. El Paso County did not provide any sensitivity training regarding transgender individuals, and their proper treatment, at any time prior to Ms. McGinn's intake and incarceration. El Paso County did not provide any training about regarding Gender Dysphoria, its causes, its treatment, and how to provide accommodations to individuals within the El Paso County Jail who suffer from Gender Dysphoria. Again, El Paso County lacked any written non-discrimination policy with respect to transgender individuals. It also lacked any policies that would alert its officials that Gender Dysphoria was a disability that required accommodation under the Americans with Disabilities Act.

50.     As a result of El Paso County's lack of adequate policies and training relating to the treatment of transgender individuals, Defendants violated Ms. McGinn's constitutional and statutory rights.

51.     El Paso County's lack of a policy relating to searches of transgender individuals stands in stark contrast to the policies of Denver, Arapahoe County, Boulder County, Larimer County, and the Colorado Department of Corrections. Denver, Arapahoe County, Boulder County, Larimer County, and the Colorado Department of Corrections all have policies that require that transgender individuals be searched (whether that search is a pat-down search, strip search, or visual body-cavity search) by a correctional officer that corresponds with the inmates' stated gender identity. Denver, Arapahoe County, Boulder County, Larimer County, and the Colorado Department of Corrections also all have policies that prohibit discriminatory treatment of transgender individuals. Upon information and belief, Denver, Arapahoe County, Boulder

County, Larimer County, and the Colorado Department of Corrections all provide training based on these policies to their correctional officers. El Paso County is an outlier in failing to have policies, and training, regarding the treatment and searching of transgender individuals. Most of these entities have had policies relating to the treatment, and searching, or transgender individuals for over five years prior to the incident underlying this lawsuit. Because of this, it would have been obvious to El Paso County that it constitutionally adequate incarceration required that it adopt policies, and training, relating to transgender individuals.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment – Equal Protection
*Against All Defendants*

52.      Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

53.      Defendants were acting under color of state law at all times relevant to this action.

54.      Under the Equal Protection Clause of the Fourteenth Amendment, discrimination against transgender people is a form of sex discrimination that is presumptively unconstitutional and subject to heightened scrutiny.

55.      Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender transition.

56.      Discrimination based on transgender status is also presumptively unconstitutional under the Equal Protection Clause and subject to strict, or at least heightened, scrutiny.

57.      Transgender people have suffered a long history of extreme discrimination across the country, in prisons and outside of prisons, and continue to suffer such discrimination to this day.

58.     Many, if not most, transgender and cisgender women who are incarcerated, including Plaintiff, have discernable feminine characteristics and secondary female-typical sex characteristics that subject them to the humiliation when searched by male deputies.

59.     Defendants' actions and inactions in requiring that male deputies, like Defendants Christopher Cable and Larry Thurman, perform cross-gender visual body-cavity searches of transgender women discriminates against Plaintiff on the basis of sex.

60.     Defendants' actions and inactions in requiring that male deputies, like Defendants Christopher Cable and Larry Thurman, perform cross-gender visual body-cavity searches of transgender women also discriminates against her based on sex stereotyping, namely, treating her as though she were a cisgender man based on the presumption that her gender identity and expression should align with her sex assigned at birth. This sex stereotyping is based solely on Plaintiff's sex assigned at birth, disregarding her gender identity even though she is a woman and has had medical treatment to bring her body into alignment with her female gender identity.

61.     Defendants' actions in subjecting Plaintiff to sexual harassment during her visual body-cavity search also subjected her to unlawful discrimination under the Fourteenth Amendment.

62.     Defendants acting under color of state law intentionally discriminated against Plaintiff by in requiring that male deputies, like Defendants Christopher Cable and Larry Thurman, conduct a cross-gender visual body-cavity search of Plaintiff.

63.     Defendants Brittany Stubbs, Loralee Salazar, and Vita Barnes failed to intervene to prevent the violation of Plaintiff's constitutional rights.

64.     Defendant's actions as described herein were taken without an important or legitimate governmental interest or rational reason, and they had no penological basis to deny Plaintiff the same searches that other women in the El Paso County Jail are allowed.

65.     Plaintiff was searched by male deputies at the El Paso County Jail in accordance with the customs, policies, and practices of the El Paso County Jail, which are set by Defendant El Paso County and Elder. Defendants El Paso County and Elder discriminated against Plaintiff and other transgender women by adopting and applying these customs policies, and practices that deny transgender women safe and appropriate searches based on their sex and transgender identity, and instead require searches based on impermissible sex stereotypes without a compelling, important, or legitimate governmental interest.

66.     Defendants' actions and inactions were taken in reckless and callous indifference to the federally protected rights of Plaintiff.

67.     The acts or omissions of Defendants were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish.

68.     As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth And Fourteenth Amendment – Unreasonable Search**
*Against All Defendants*

69.     Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

70.     Defendants were acting under color of state law at all times relevant to this action.

71.     Plaintiff has a legitimate expectation of privacy in her body being free from unreasonable governmental search.

72.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them. Namely, there was no basis for Defendants to perform a cross-gender visual body-cavity search of Plaintiff or to watch Plaintiff shower. Defendants' cross-gender visual body-cavity search while laughing at her was objectively unreasonable.

73.     Defendants El Paso County and Elder's custom, policy, and practice of requiring, per official policy, male deputies to perform cross-gender visual body-cavity searches of transgender women, and to allow male deputies to watch transgender women shower, caused the violation of Plaintiff's rights and it would have been obvious and foreseeable to Defendants El Paso County and Elder that their custom, policy, and practice of requiring male deputies to perform visual body-cavity searches of transgender women would cause a violation of Plaintiff's constitutional rights in the manner in which that violation occurred.

74.     Defendants El Paso County and Elder's custom, policy, and practice of requiring, per official policy, deputies to blanketly perform a visual body-cavity search of every person, upon intake to the facility, no matter their security threat status, the crime they are arrested for allegedly violating, or their risk of bringing contraband into the facility violates the Constitution and caused the violation of Plaintiff's constitutional rights.

75.     Defendants' actions and inactions were taken in reckless and callous indifference to the federally protected rights of Plaintiff.

76.     The acts or omissions of Defendants were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish.

77.     As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Invasion of Bodily Privacy and Integrity**
*Against All Defendants*

78.     Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

79.     Defendants were acting under color of state law at all times relevant to this action.

80.     By engaging in a cross-gender visual body-cavity of Plaintiff, and by watching Plaintiff shower, without her consent, Defendants violated Plaintiff's right to be secure in her bodily integrity, a liberty interest protected by the Due Process Clause of the Fourteenth Amendment.

81.     Defendants El Paso County and Elder recklessly, with conscious disregard to the serious and obvious risk to the safety of transgender inmates like Plaintiff, violated Plaintiff's right to be secure in her bodily integrity by requiring male deputies to conduct cross-gender visual body-cavity searches of transgender women.

82.     Defendants El Paso County and Elder knew that their acts or omissions were substantially certain to cause El Paso County officials to violate constitutional rights of transgender inmates like Plaintiff to be free from secure in their bodily integrity, and Defendants El Paso County and Elder consciously or deliberately chose to disregard this risk of harm in failing to provide and/or in deliberately choosing not to change the policy that required, per official policy, male deputies to perform cross-gender visual body-cavity searches of transgender women.

83.     Defendants El Paso County and Elder exhibited deliberate indifference to the substantial and obvious risk of harm to Plaintiff, and other transgender inmates, by continuing to require, per official policy, male deputies to perform cross-gender visual body-cavity searches of transgender women.

84.     Defendants El Paso County and Elder proximately caused an unconstitutional invasion of Plaintiff's bodily integrity by continuing to require, per official policy, male deputies to perform cross-gender visual body-cavity searches of transgender women.

85.     Defendants El Paso County and Elder set in motion a series of events that they knew would cause an inmate in a similar situation as Plaintiff to be deprived of her constitutional right to be secure in her bodily integrity; but for the above acts or omissions of Defendants, Plaintiff would not have been subjected to a violation of her constitutional rights; and such a deprivation was a natural and foreseeable consequence of these acts and omissions.

86.     Defendants El Paso County and Elder's custom, policy, and practice of requiring, per official policy, male deputies to perform cross-gender visual body-cavity searches of transgender women, and to allow male deputies to watch transgender women shower, caused the violation of Plaintiff's rights and it would have been obvious and foreseeable to Defendants El Paso County and Elder that their custom, policy, and practice of requiring male deputies to perform visual body-cavity searches of transgender women would cause a violation of Plaintiff's constitutional rights in the manner in which that violation occurred.

87.     Defendants El Paso County and Elder's custom, policy, and practice of requiring, per official policy, deputies to blanketly perform a visual body-cavity search of every person, upon intake to the facility, no matter their security threat status, the crime they are arrested for

allegedly violating, or their risk of bringing contraband into the facility violates the Constitution and caused the violation of Plaintiff's constitutional rights.

88.     The policies implemented by Defendants El Paso County and Elder, as well as Defendants' actions and inactions, violated Plaintiff's substantive due process right to bodily integrity under the Fourteenth Amendment to the United States Constitution.

89.     Defendants' actions and inactions were taken in reckless and callous indifference to the federally protected rights of Plaintiff.

90.     When viewed in total, this conduct is outrageous and shocks the conscience.

91.     The acts or omissions of Defendants were the legal and proximate cause of Plaintiff's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish.

92.     As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**FOURTH CLAIM FOR RELIEF**
**U.S.C. § 12101, *et. seq.* – Americans with Disabilities Act**
**Disability Discrimination**
*Against Defendant El Paso County*

93.     Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

94.     Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

95.     In particular, in providing any aid, benefit, or service, under Title II of the ADA, a

public entity "may not ... [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," or "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others[.]" 28 C.F.R. § 35.130(b)(1)(i), (ii), (iii), and (vii).

96.     A public entity "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

97.     A public entity may not (1) "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary," 28 C.F.R.§ 35.130(b)(8); or (2) "utilize criteria or methods of administration … that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability … or the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)(ii).

98.     A public entity is also prohibited from aiding and perpetuating discrimination against persons with disabilities in the programs, services, or activities it provides. 28 C.F.R. § 35.130(b)(1)(v).

99.     The ADA's "integration mandate" requires public entities to "administer services,

programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); see also Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services, originally published July 26, 1991, 28 C.F.R. pt. 35, App. B ("Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status.").

100.   Defendant El Paso County violated the rights of Plaintiff secured by Title II of the ADA and its implementing regulations.

101.   El Paso County is currently, and at all times relevant to this action has been a "public entity" as defined by the ADA, 42 U.S.C. § 12131(1)(B), and provides a "program, service, or activity" within the meaning of the ADA, including educational and rehabilitative programs and services.

102.   Plaintiff suffers from Gender Dysphoria.

103.   Gender Dysphoria is not excluded under the ADA, 42 U.S.C. § 12211(b)(1), because it is a gender identity disorder that results from a physical impairment. In 2015, the U.S. Department of Justice concluded that, "[i]n light of the evolving scientific evidence suggesting that Gender Dysphoria may have a physical basis, along with the remedial nature of the ADA and the relevant statutory and regulatory provisions directing that the terms 'disability' and 'physical impairment' be read broadly, the [ADA's exclusion of gender identity disorders not resulting from a physical impairment] should be construed narrowly such that Gender Dysphoria falls outside its

scope."[2]

104.   Alternatively, Gender Dysphoria is not excluded under the ADA because it is not a "gender identity disorder" under 42 U.S.C. § 12211(b)(1)—it is a dysphoria.

105.   Because of the date of the actions complained of, the expanded definition of "disability" under the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") applies.

106.   Under the ADAAA and DOJ regulations, the definition of disability is to be construed broadly in favor of expansive coverage. 42 U.S.C. § 12102(4)(A); 28 C.F.R. §§ 35.108(a)(2)(i), 35.108(d)(1)(i). Accordingly, the terms "substantially" and "major" in the definition of disability are to be interpreted consistently with the ADAAA's findings and purposes, which reinstate "the broad scope of protection intended to be afforded by the ADA" and convey Congress's intent "that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 42 U.S.C. §§ 12102(4)(B), ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ (2)(a)(5), (b)(5).

107.   In determining disability, the ADAAA requires that impairments must be assessed "without regard to the ameliorative effects of mitigating measures," such as medication, therapy, and reasonable accommodations. 42 U.S.C. § 12102(4)(E)(i).

108.   In determining disability, the ADAAA requires that impairments that are "episodic or in remission" must be assessed in their active state. 42 U.S.C. § 12102(4)(D).

109.   In determining disability, a "major life activity" includes "the operation of a major bodily function," including neurological, brain, and reproductive functions. 42 U.S.C. §

---

[2] Second Statement of Interest of the United States at 5, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015).

12102(2)(B).

110.     Under the ADAAA and DOJ regulations, "an individual meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities if the individual establishes that he or she has been subjected to an action prohibited under th[e ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §§ 12102(3)(A); see also 28 C.F.R. § 35.108(f)(1); ADA Amendments Act of 2008, Pub. L. No. 110-325, § (2)(b)(3) (reinstating "broad view of the third prong" of the definition of disability). Accordingly, no showing of substantial limitation of a major life activity is required under the regarded-as prong. 28 C.F.R. § 35.108(a)(2)(iii) ("[T]he 'regarded as' prong of the definition of "disability" . . . does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment.").

111.     Plainitff's Gender Dysphoria substantially limits one or more major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and also substantially limits the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

112.     Plaintiff has a record of Gender Dysphoria, which substantially limits one or more major life activities, including her ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating, interacting with others, and reproducing, and also substantially limits the operation of major bodily functions, including neurological function, brain function, endocrine function, and reproductive function.

113.     Plaintiff "meets the requirement of 'being regarded as having' an impairment that

substantially limits one or more major life activities" because El Paso County excluded her from participation in and denied her the benefits of El Paso County's programs, services, and activities based on Gender Dysphoria, and also subjected her to discrimination based on Gender Dysphoria.

114.    Plaintiff is currently and at all times relevant to this action has been a "qualified individual with a disability" within the meaning of Title II of the ADA.

115.    As an inmate in the custody of El Paso County, Plaintiff was qualified to participate in El Paso County's programs, services, and activities. El Paso County provides these services to other inmates committed to its custody.

116.    El Paso County failed to provide reasonable modification to its policies, procedures, and practices regarding Ms. Griffith, as it was legally required to do. 28 C.F.R. § 35.130(b)(7). El Paso County did not attempt accommodations such as gender-appropriate searches and showering. By virtue of the fact that El Paso County did not put these or other reasonable modifications in place, Plaintiff was discriminated against because of her disabilities.

117.    By forcing Plaintiff to shower in front of male deputies and to endure a cross-gender visual body-cavity search, El Paso County subjected Plainitff to discrimination based on Gender Dysphoria.

118.    Defendants' actions and inactions were taken in reckless and callous indifference to the protected rights of Plaintiff.

119.    Defendants' acts or omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

120.    As a direct and proximate cause and consequence of the unconstitutional policies,

procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**FIFTH CLAIM FOR RELIEF**
**U.S.C. § 701, *et. seq.* – Rehabilitation Act of 1973**
**Disability Discrimination**
*Against Defendant El Paso County*

121.    Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

122.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

123.    El Paso County accepts federal financial assistance and has done so at all times relevant to this Third Amended Complaint. El Paso County is therefore a "program . . . receiving Federal financial assistance" for purposes of the Rehabilitation Act. 214. The definition of disability is identical under the ADA and Rehabilitation Act, and the expanded definition of "disability" under the ADAAA applies with equal force to the definition of "disability" under Section 504 of the Rehabilitation Act. See ADA Amendments Act of 2008, Pub. L. No. 110-325, §7 (conforming Section 504 of Rehabilitation Act's definition of "disability," 29 U.S.C. § 705, to definition of disability "in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102))."

124.    Plaintiff suffers from Gender Dysphoria, which substantially limits one or more major life activities and also the operation of major bodily functions. Plaintiff "meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities" because El Paso County excluded her from participation in and denied her

the benefits of El Paso County's programs, services, and activities based on Gender Dysphoria, and also subjected her to discrimination based on these impairments.

125.     Gender Dysphoria is not excluded under the Rehabilitation Act because it is a gender identity disorder that results from a physical impairment or, alternatively, it is not a gender identity disorder—it is a dysphoria.

126.     Plaintiff is currently and at all times relevant to this action has been a "qualified individual with a disability" for purposes of the Rehabilitation Act.

127.     By forcing Plaintiff to shower in front of male deputies and to endure a cross-gender visual body-cavity search, El Paso County subjected Plainitff to discrimination based on Gender Dysphoria in violation of Section 504 of the Rehabilitation Act.

128.     Defendants' actions and inactions were taken in reckless and callous indifference to Plaintiff's protected rights.

129.     Defendants' acts and omissions were the legal and proximate cause of Plaintiff's damages in that she suffered physical pain and suffering, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

130.     As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff suffered and continues to suffer injuries, damages and losses as set forth herein.

**SIXTH CLAIM FOR RELIEF**
**Negligent Operation of A Correctional Facility**
*Against Defendants El Paso County and Elder*

131.     Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

132.    Defendants had a duty to exercise reasonable care in the training and supervision of their employees in a manner that provided the detainees under their care with reasonable treatment.

133.    Defendants owed a duty to Plaintiff to house her "in a safe and effective manner." *Nieto*, 952 P.2d at 839; *see also Pack v. Arkansas Valley Correctional Facility*, 894 P.2d 34, 37 (Colo. App. 1995); *Howard v. City & County of Denver*, 837 P.2d 255, 257 (Colo. App. 1992) ("duties in keeping jail are to receive and safely detain every person duly committed therein"). Under C.R.S. § 16-3-401, "persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment."

134.    Defendants breached their duty to exercise reasonable care in the training and supervision of their subordinate employees.

135.    Defendants, because they knew or should have known of the lack of supervision, experience and training among their employees, also had reason to know that its employees were likely to harm transgender, including Plaintiffs.

136.    In failing to exercise reasonable care in the training and supervision of their employees relative to their providing reasonable conditions of confinement, including searches and appropriate non-discriminatory treatment, Defendants were negligent.

137.    The negligence of Defendants proximately caused Plaintiff significant physical and mental pain and suffering and other damages.

### SEVENTH CLAIM FOR RELIEF
#### Outrageous Conduct
*Against Defendants Brittany Stubbs, Christopher Cable,*
*Larry Thurman, Loralee Salazar, and Vita Barnes*

138.    Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

139.    The behavior of Defendants in subjecting Plaintiff to the humiliating visual body-cavity search was so outrageous and so extreme that reasonable members of the community would regard such behavior as atrocious.

140.    Defendants knew or should have known that their conduct would cause Plaintiff severe emotional distress.

141.    Defendants' described actions and inactions were utterly intolerable, and would lead a reasonable member of the community to conclude that their conduct was extreme and outrageous.

142.    As a result of Defendants' conduct, Plaintiff has suffered damages and losses, including severe emotional distress and pain and suffering.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against each Defendant, and award her all relief allowed by law, including but not limited to the following:

A.    All appropriate relief at law and equity;

B.    Declaratory relief and other appropriate equitable relief;

C.    Injunctive relief, including repeal of the policies that caused the unconstitutional searched of Plaintiff;

D.    Economic losses on all claims as allowed by law;

E.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

F.      Punitive damages on all claims allowed by law and in an amount to be determined at trial;

G.      Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

H.      Pre-and post-judgment interest at the lawful rate; and

I.      Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 12th day of September 2022.

KILLMER, LANE & NEWMAN, LLP

*/s/ Andy McNulty*
Andy McNulty
Mari Newman
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
amcnulty@kln-law.com
mnewman@kln-law.com

COUNSEL FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2022, I electronically filed the foregoing **SECOND AMENDED COMPLAINT AND JURY DEMAND** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Nathan Whitney
Steven W. Martyn
El Paso County Attorney's Office
200 S. Cascade Ave.
Colorado Springs, CO 80903
terrysample@elpasoco.com
stevenmartyn@elpasoco.com

*s/ Charlotte Bocquin Scull*
Paralegal